**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 98-057** |
| **v.** | * | **SECTION: "B"** |
| **DONALD A. DYER** | * | |

* * *

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR**
**COMPASSIONATE RELEASE BECAUSE OF THE COVID-19 PANDEMIC**

The United States of America, through the undersigned Assistant United States Attorney, asks that this Court deny the defendant's motion for compassionate release based on concerns arising from the COVID-19 pandemic. *See* Rec. Doc. No. 493. (Defendant's Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)). The defendant has failed to demonstrate that he meets the requirements for compassionate release on the merits. The defendant cites no authority for this Court to order the Bureau of Prisons to grant him home confinement—only BOP has the authority to determine inmate placement. The defendant has failed to specify any authority for his release, nor is any available to him.

**FACTUAL BACKGROUND**

On October 2, 1998, the defendant pled guilty to Count 1 of the Superseding Indictment and was convicted of participating in a conspiracy to possess with intent to distribute heroin. Rec. Doc. No. 126. On October 19, 2000, this Court sentenced defendant to 400 months of imprisonment[1]. Rec. Doc. No. 256. The defendant has served 22 years of that sentence and is currently housed at Yazoo City Medium FCI in Yazoo, Mississippi with a projected release date of

---

[1] Due to the age of this case, the historical court files are not available. BOP records indicated that defendant's sentence is 320 months, which is consistent with defendant's representation in his motion. Rec. Doc. No. 493 at page 1.

April 21, 2022. *See* https://www.bop.gov/inmateloc/. The defendant now moves for a sentence reduction based on the compassionate release statute, relying on the threat posed by the COVID-19 pandemic.

## I.     BOP's response to the COVID-19 pandemic.

In response to the COVID-19 pandemic, BOP has taken significant measures aimed at inmate safety and, when appropriate, release to home confinement. As the Attorney General's April 3, 2020, memorandum reflects, BOP is modifying its response to the virus on a daily—even hourly—basis and prioritizing the release of at-risk prisoners to home confinement.[2] Indeed, BOP has been planning for potential COVID-19 transmissions since January, establishing a working group to develop policies in consultation with experts in the Centers for Disease Control, the World Health Organization, and others.[3] BOP then developed a COVID-19 action plan that it has continued to revise and update in response to the fluid nature of the COVID-19 pandemic and in response to the latest expert guidance. The plan comprises many preventive and mitigation measures, including screening all incoming inmates; regularly screening staff; limiting contractor visits to essential services; suspending nearly all attorney, social, and volunteer visits; limiting inmate movement between facilities; and taking additional steps to modify operations to maximize social distancing.

---

[2] *See* https://www.justice.gov/file/1266661/download.

[3] Since 2012, BOP has had a Pandemic Influenza Plan in place. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

As updated, the current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells to reduce any spread of the disease.[4]  BOP states that only limited group gatherings are permitted and then with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. With exceptions for medical treatment and similar exigencies, this step also is intended to limit transmission of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. BOP advises that staff and inmates have been issued cloth face masks to use when social distancing cannot be achieved.[5]

Further, BOP states that every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms.[6] Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.[7] In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. BOP reports that staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone, and others with less serious symptoms can be placed on leave by medical staff.[8]

In addition, contractor access to BOP facilities has been restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform

---

4 *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
5 *See* https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.
6 *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
7 *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
8 *See* https://www.bop.gov/coronavirus/docs/covid19_staff_screening_tool_v2.8_20200327.pdf.

necessary maintenance on essential systems.[9] BOP reports that all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access is screened for symptoms and risk factors. Social and legal visits are suspended to limit the number of people entering the facility and interacting with inmates. To help ensure that family relationships are maintained throughout its modified operations, BOP has increased detainees' telephone allowance to 500 minutes per month. Under the plan, legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at its regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Also, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.[10] That authority includes the ability to place an inmate in home confinement during the last six months or 10 percent of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized

---

9 *See* https://www.bop.gov/coronavirus/covid19_status.jsp.
10 *See* https://www.bop.gov/resources/news/pdfs/20200405_covid-19_home_confinement.pdf.

to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).[11] On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.[12] As of this filing, BOP has transferred 7,737 inmates to home confinement since the Attorney General's March 26 directive.

Taken together, BOP advises that all these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution and that it will initiate additional measures as appropriate. As of this filing, BOP reports that 1,995 inmates and 703 staff have confirmed positive test results for COVID-19 nationwide, with 124 inmate deaths and 2 staff deaths and with 11,972 inmate recoveries and 1,084 staff recoveries, out of about 152,000 inmates and 36,000 staff nationwide. At Yazoo City Medium, BOP reports that one inmate and six staff have confirmed positive test results for COVID-19, with no inmate deaths and no staff deaths and with seven inmate recoveries and ten staff recoveries.[13]

In addition to these considerations, BOP advises that it must continue other critical operations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public and take into account the effect of a mass release on the safety and health of both the inmate population and the community. It must allocate resources to care for inmates in the most beneficial and efficient manner possible and assess release plans, which are essential to ensure that a defendant has a safe place to live and

---

[11] This gives BOP the authority to set an inmate's term of home confinement without the statutory limitation to only the last six months or 10 percent of his sentence.

[12] *See* https://www.justice.gov/file/1266661/download.

[13] *See* https://www.bop.gov/coronavirus/index.jsp.

access to health care on release. BOP also must balance many other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.     Defendant's conviction and other relevant background

On July 21, 2020, Dyer administratively requested that he be placed on home confinement status for the remainder of his sentence due to COVID-19. Rec. Doc. No. 493 at p. 4. Defendant states that he has always suffered from asthma since childhood and he has completed 90% of his sentence. *Id*. On August 16, 2020, defendant's request was denied by the warden because "his concern about being potentially exposed to, or possibly contracting COVID-19 does not currently warrant an early release from his sentence." Rec. Doc. No. 493 at p. 6.

According to BOP regional counsel, BOP has not considered the defendant for home confinement based on his inmate profile which indicates that he has a high risk of recidivism. To qualify for home confinement, an inmate must have a minimum risk of recidivism. At the time of his sentence in 1999, Dyer had 13 criminal history points and a criminal history category of VI. *See* PSR for Dyer, at p.11, para. 70.

On August 31, 2020, the defendant filed a motion requesting that this Court apply the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), to release him from his prison sentence. As set forth below, the government opposes such release.

<u>**LAW AND ARGUMENT**</u>

**I.      The defendant has not satisfied the requirements for compassionate release.**

    **A.      Legal framework.**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment.[14] Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. 18 U.S.C. § 3582(c)(1)(A). A district court may grant the defendant's motion for a reduction in his sentence only if the motion is filed (1) "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*[15] "The statute's language is mandatory." *United States v. Franco*, No. 20-60473, 2020 WL 5249369, at *2 (5th Cir. Sept. 3, 2020).

If the defendant meets this exhaustion requirement, then a district court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the

---

14 Section 603(b) of the First Step Act of 2018 allowed defendants for the first time to seek this relief from the Court. Previously, only the BOP could request such relief.

15 The government acknowledges that some courts have required a defendant to exhaust his administrative appeals before filing a § 3582(c)(1)(A) motion. *See, e.g.*, *United States v. Ansari*, No. CR 07-337, 2020 WL 4284340, at *4 (E.D. La. July 27, 2020) (Fallon, J.); *United States v. Ellis*, No. CR 13-286, 2020 WL 4050409, at *2 (E.D. La. July 20, 2020) (Vance, J) (collecting cases). The government, however, maintains that, under § 3582(c)(1)(A), either exhaustion of BOP administrative appellate rights or the expiration of thirty days after transmitting a request to the warden—"whichever is earlier"—is all that is required for a court to consider the motion. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (not precedential) (agreeing with government concession that "or" and "whichever is earlier" means that while inmates can satisfy the statute's thirty-day requirement by exhausting all BOP administrative remedies, they independently can satisfy the requirement by transmitting a request to the warden and waiting 30 days before filing a motion with the district court).

Sentencing Commission." § 3582(c)(1)(A)(i). The defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014); *see also United States v. Davis*, No. CR 07-357, 2020 WL 2838588, at *2 (E.D. La. June 1, 2020) (Africk, J.) ("The defendant bears the burden of demonstrating that he is entitled to compassionate release and that he has exhausted his administrative remedies.").

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a district court may reduce the term of imprisonment after considering the § 3553(a) factors if it finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Finally, the note permits the BOP Director to identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).[16]

The Fifth Circuit has held that this requirement is not jurisdictional but is a mandatory claim-processing rule that must be enforced if properly raised by the government. *United States v. Franco*, 2020 WL 5249369, at *2 (5th Cir. Sept. 3, 2020). The Fifth Circuit stated:

> The First Step Act, in clear language, specifies what a defendant must do before she files a motion for compassionate release in federal court. Specifically a defendant must submit a request to "the Bureau of Prisons to bring a motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A).
>
> The statute's language is mandatory. Congress has commanded that a "court *may not* modify a term of imprisonment" if a defendant has not filed a request with the BOP. *See id.* § 3582(c) (emphasis added). This rule "seek[s] to promote the orderly process of litigation by requiring that the parties take certain procedural steps at certain specified times." It is a paradigmatic mandatory claim-processing rule. And because the government properly raised the rule in the district court, this "court *must* enforce the rule."

*Id.* (citations omitted, emphasis in original).[17]

---

[16] The policy statement refers only to motions filed by the BOP Director. The policy statement was last amended on November 1, 2018, before enactment of the First Step Act when defendants were not allowed to file motions under § 3582(c)(1)(A). *Cf.* First Step Act § 603(b). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), the government maintains that policy statement remains binding and empowers defendants to seek relief from the Court as defined in Application Note 1(A) through (C). However, as explicitly stated in Application Note 1(D), the BOP retains sole authority to identify other reasons beyond those set forth in Application Note 1(A) through (C). The government acknowledges that not all district courts have agreed with its position.

[17] The Fifth Circuit, however, did not address—and district courts have disagreed about—whether, when a warden denies a request for compassionate release within thirty days of an inmate's request, the inmate must exhaust BOP administrative remedies before filing a motion for compassionate release with the courts, the government disagrees and has conceded otherwise. On appeal in the Third Circuit, the government conceded that it erred in the district court in arguing that administrative exhaustion was

Beyond being mandatory, Congress's exhaustion requirement makes good sense. BOP's regulations require a thorough assessment of such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g).[18] This allows BOP to apply its considerable expertise concerning both the inmate and the conditions of confinement. Moreover, as discussed above, BOP has been prioritizing the availability of home confinement and has implemented numerous anti-COVID-19 protocols to protect inmates during rapidly changing times.[19]

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Joseph*, No. CR 15-307,

---

required beyond the thirty day statutory provision, and the Third Circuit agreed and remanded the case to the district court for a decision on the merits. *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (not precedential). As the Third Circuit recognized, an inmate may file a request in the district court thirty days after presenting the request to the warden, whether the administrative process is complete or not. *Id.* Section 3582(c)(1)(A) "states that the defendant may file the motion thirty days after the warden receives his request[,]" not, as the government erroneously had argued in the district court, only after the defendant has completely exhaustion the administrative process when BOP denied his request within thirty days. *Id.*

18 *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The government notes, however, that there are differences between the criteria in the Program Statement that BOP uses to determine a reduction in sentence and the governing criteria and interpretation of the operative Sentencing Guideline here, such that if BOP has denied a request internally for not meeting its criteria, this does not require the same result under § 1B1.13, which is guided by merits considerations including dangerousness and the applicable § 3553(a) factors.

19 *See* https://www.bop.gov/coronavirus/.

10

2020 WL 3128845, at *2 (E.D. La. June 12, 2020) (Vance, J.) ("[T]he BOP not only is aware of COVID-19, but also has taken its own measures to address the disease's impact. Furthermore, in doing so, the BOP had to use its expertise to consider both the impact of COVID-19 on individual prisoners, as well as the system-wide consequences of releasing prisoners as a response.") (footnote omitted).

    Here, the defendant alleges that he submitted a request to the warden but claims he has not received a response. Rec. Doc. No. 493 at p. 1. Yet attached to his motion is both his request for compassionate relief as well as the warden's response, denying his request. *Id*. at pp 4-6. Although the exhaustion requirement is critical, the government's position is that an inmate need not "exhaust" administrative remedies if the motion is filed in a district court 30 days after receipt of a request to the warden. Here, Dyer has satisfied the procedural requirements of bringing a compassionate release motion on his own behalf.

**B.**    **This Court should deny compassionate release on the merits because the defendant has failed to present any "extraordinary and compelling reasons" warranting a reduction and fails to established that his medical condition satisfies a CDC risk factor.**

**1. CDC risk factors are critical to determining whether a defendant has established "extraordinary and compelling reasons" for a sentence reduction based on COVID-19.**

The defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a district court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines

11

"extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. U.S.S.G. § 1B1.13, cmt. n.1(A).[20]

As a district judge here has explained: "The application notes to the relevant policy statement identify three discrete 'extraordinary and compelling reasons' that could warrant a reduction: (a) a 'terminal illness' or a condition that 'substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover'; (b) '[a]ge'—starting at age 65; and (c) '[f]amily [c]ircumstances.'" *United States v. Neal*, No. CR 11-28, 2020 WL 4334792, at *1 (E.D. La. July 28, 2020) (Vance, J.) (citing § 1B1.13, application note 1(D) (emphasis omitted)) (brackets omitted). "'The Guidelines also identify a category of '[o]ther [r]easons,' but state that such reasons are '[a]s determined by the Director of the Bureau of Prisons.'" *Id.* (citing § 1B1.13, application note 1(D) (emphasis omitted)).

The categories encompass specific conditions and circumstances afflicting an individual inmate, not generalized threats to the entire population. Accordingly, general COVID-19 concerns do not fall into any of the categories and do not serve as a basis for relief. Rather, the grounds for compassionate release the Sentencing Commission identified are all based on inherently individual circumstances, not comparable to the general COVID-19 concerns that thousands of offenders could assert in compassionate-release motions today. As the Third Circuit has observed, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone

---

[20] Although some courts disagree, the government's position is that the policy statement is binding under the express terms of Section 3582(c)(1)(A), and because it concerns only possible sentence reductions, not increases, it is not subject to the rule of *Booker v. United States*, 543 U.S. 220 (2005), that any guideline that increases a sentence must be deemed advisory. *See Dillon v. United States*, 560 U.S. 817, 830 (2010) (making clear that the statutory requirement in § 3582 that a court heed the restrictions stated by the Sentencing Commission is binding).

cannot independently justify compassionate release." *Raia*, 954 F.3d at 597; *see also United States v. Deville*, No. CR 15-293, 2020 WL 4471525, at *2 (E.D. La. Aug. 4, 2020) (Zainey, J.) ("[T]he fear of a communicable disease does not warrant a sentence modification.") (quotation marks and brackets omitted); *United States v. Wilfred*, No. CR 07-351, 2020 WL 4365531, at *5 (E.D. La. July 30, 2020) (Africk, J.) ("Wilfred has alleged only general concerns that the fact of being in a carceral setting raises the risk of COVID-19 infection. Numerous courts have concluded that such broad allegations do not warrant a sentence reduction under § 3582.") (footnote omitted); *United States v. Curry*, No. CR 10-111, 2020 WL 4201646, at *2 (E.D. La. July 22, 2020) (Vance, J.) ("At the heart of Curry's request is a generalized fear of COVID-19. He argues that if, 'hypothetically,' were he to contract the virus, he would be 'finished.' A generalized fear of the virus, by itself, does not justify release.") (footnote omitted).[21] Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates.

That does not mean, however, that COVID-19 is irrelevant to the Court's analysis of a motion under § 3582(c)(1)(A), but rather that the motion is evaluated under the CDC medical risk factors affecting the likelihood of severe outcomes with COVID-19.[22] The CDC divides the risk factors into two categories. First, the CDC presents a list of conditions that, according to current data, definitively entail a greater risk of severe illness. The government acknowledges that, during the current COVID-19 pandemic, an inmate who presents one of the risk factors on that list, as confirmed by medical records, and who is not expected to recover from that condition, presents an

---

21 The Fifth Circuit has affirmed the pre-trial denial of bond when the defendant argued, among other things, that her cancer diagnosis and the COVID-19 pandemic justified home confinement, *United States v. Barton*, 804 F. App'x 295, 296 (5th Cir. 2020), and has denied prisoners' motions for bail pending appeal that rested on COVID-19 concerns. *See United States v. Anderson*, Fifth Cir. No. 19-10963 (3/19/20 & 3/23/20 orders).

22 *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

extraordinary and compelling reason allowing compassionate release under the statute and guideline policy statement, even if that condition in ordinary times would not allow compassionate release. Such a chronic medical condition presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.[23] As of July 17, 2020, the CDC included the following conditions as placing a person at an increased risk of severe illness from COVID-19: Cancer; chronic kidney disease; COPD (chronic obstructive pulmonary disease); immunocompromised state (weakened immune system) from solid organ transplant; obesity (body mass index [BMI] of 30 or higher); serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; and Type 2 diabetes mellitus.[24]

In addition to listing certain conditions that place people at increased risk of severe illness from COVID-19, the CDC guidance currently presents a second list of conditions that "might" increase the risk of severe illness.[25] In an update posted on July 27, 2020, the CDC advised with

---

[23] The government notes that some district courts have disagreed with this position. *See, e.g.*, *United States v. Mondragon*, No. 4:18-CR-132(5), 2020 WL 3868988, at *3-5 (E.D. Tex. July 8, 2020); *United States v. Frost*, No. 3:18-CR-30132-RAL, 2020 WL 3869294, at *3-5 (D.S.D. July 9, 2020).

[24] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[25] Conditions that might be at increased risk are: Asthma (moderate-to-severe); cerebrovascular disease (affects blood vessels and blood supply to the brain); cystic fibrosis; hypertension or high blood pressure; immunocompromised state (weakened immune system) from blood or bone marrow transplant; immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pregnancy; pulmonary fibrosis (having damaged or scarred lung tissues); smoking; thalassemia (a type of blood disorder); and Type 1 diabetes mellitus. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

regard to conditions on the second list: "COVID-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19."[26] Given the lack of data and certainty regarding this second group of conditions, an inmate with one or more of these conditions does not present an "extraordinary and compelling reason" under the compassionate release statute and U.S.S.G. § 1B1.13.

A defendant has the burden of establishing "extraordinary and compelling" circumstances, *e.g.*, *United States v. Washington*, No. CR 16-19, 2020 WL 4000862, at *3 (E.D. La. July 15, 2020) (Morgan, J.), which, for COVID-19 purposes, means demonstrating that the defendant has a medical condition that definitively entails a greater risk of severe illness under the CDC risk factors and that he is not expected to recover from that condition. The defendant has not satisfied his burden here.

## 2.   The defendant has failed to produce medical records or other evidence to demonstrate that he has a medical condition that constitutes a CDC risk factor for COVID-19.

Dyer is 52 years old and references no applicable "family circumstances" therefore his request for compassionate release must be based on medical grounds. The defendant asserts that he suffers from asthma but has produced no credible medical evidence to support this claim. BOP provided the government with copies of defendant's medical records for the last two years and there was no mentioned of asthma or any other disease or medical condition that constitutes a CDC risk factor for COVID-19. *See United States v. Henderson*, No. CR 11-271, 2020 WL 2850150, at *3 (E.D. La. June 2, 2020) (Milazzo, J.) ("Defendant does not point to, nor do the medical records

---

[26] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

provided by the Government reveal, any medical condition that might warrant an extraordinary and compelling reason to grant his release") (footnote omitted).

Of significance is that defendant claims he has suffered from asthma since childhood, but his final Presentence Investigation Report from 1999 states "defendant is presently not taking any prescription medication and is not under the care of a physician. He describes his overall health as good." (PSR for Donald Dyer, January 14, 1999 at page 14, paragraph 92). Accordingly, in 1999 defendant did not complain of any aliments let alone a lifelong asthmatic condition. *See United States v. Sonnier*, No. CR 14-168, 2020 WL 4601638, at *3 (E.D. La. Aug. 11, 2020) (Africk, J.) ("Sonnier claims to suffer from asthma and other respiratory conditions. As the government observes, the presentence investigation report does not mention these illnesses, and Sonnier's BOP medical records do not reflect that they have manifested while Sonnier has been in BOP custody.") (footnote omitted); *United States v. Hankton*, No. CR 12-1, 2020 WL 3581734, at *2 (E.D. La. July 1, 2020) (Feldman, J.) ("[T]ellingly, Hankton did not mention his alleged hypertension when he requested compassionate release from the Bureau of Prisons; he mentioned only epilepsy), *appeal docketed*, No. 20-30429 (5th Cir. July 15, 2020).

In view of the defendant's failure to support his allegations with credible medical evidence, the defendant has no "extraordinary and compelling reason" for compassionate release, and his motion should be denied. *See United States v. Deville*, No. CR 15-293, 2020 WL 4471525, at *2 (E.D. La. Aug. 4, 2020) (Zainey, J.) ("[T]he Court finds that Deville has failed to present evidence of extraordinary and compelling reasons to modify her prison sentence. Indeed, she has produced little medical evidence of her current condition or diagnosis to satisfy her burden to establish her entitlement to a sentence reduction. More specifically, Deville claims that she suffers from

depression and anxiety. However, these medical conditions do not place her at an increased risk of severe illness from COVID-19.") (citations omitted).

### 3. The defendant has failed to identify or demonstrate that he has a medical condition identified by the CDC as presenting a likelihood of a severe outcome.

Additionally, Dyer has not identified a medical condition that falls within one of the CDC categories that presents a likelihood of a severe outcome from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. *See United States v. Jones*, No. CR 15-61, 2020 WL 3606369, at *5 (E.D. La. July 2, 2020) (Morgan, J.) ("Sleep apnea and hypertension are not the CDC's list of COVID -19 risk factors, and Jones has not met his burden of showing they render him particularly susceptible to COVID-19. While a serious heart condition is on the CDC's list of factors that may increase a person's risk of severe illness due to COVID-19, Jones has not pointed to evidence establishing he actually suffered a heart attack or suffers any serious heart problems.").

At best, the defendant's asserted condition - asthma - falls within the CDC's list of factors that "might" increase the risk of severe illness. Given the lack of data and certainty as to the "might" category of CDC factors, the defendant does not allege, much less prove, that he has a medical condition constituting an "extraordinary and compelling reason" for compassionate release.

Accordingly, because the defendant has failed to establish an extraordinary and compelling reason for his release based on COVID-19, his motion should be denied. *See United States v. Johnson*, No. CR 13-137, 2020 WL 4284350, at *3 (E.D. La. July 27, 2020) (Ashe, J.) ("Johnson's motion should be denied even if it were considered on the merits because he has not identified a medical condition, age, or family circumstances that might warrant an extraordinary and

compelling reason for release."); *United States v. Brown*, No. CR 13-243, 2020 WL 2542899, at *3 (E.D. La. May 19, 2020) (Vance, J.) ("Defendant is fifty years old, and does not point to any medical or family circumstances that would justify compassionate release. Rather, she argues for release on account of her allegedly increased risk of contracting COVID-19 based on her age, race, and gender. Even if these individual characteristics were to make her more likely to contract COVID-19, these factors do not correspond to the types of extraordinary reasons this Court must consider before granting compassionate release.").

**4.    The defendant has not carried his burden of establishing that he does not pose a significant danger to the safety of the community, and the applicable § 3553(a) factors weigh against release.**

To obtain compassionate release, the defendant has the burden to "demonstrate that he 'is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'" *United States v. Reed*, No. CR 15-100, 2020 WL 2850145, at *4 (E.D. La. June 2, 2020) (Fallon, J.) (quoting U.S.S.G. § 1B1.13).

Defendant has a lengthy criminal history, including violent crimes. The danger posed to the community by drug offenders is large, and armed drug offenders in particular, is well established. *See United States v. Hare*, 873 F.2d 796, 798-99 (5th Cir. 2004).  Defendant's PSR indicates that law enforcement seized firearms from defendant's residence. PSR, p.7, para.30. Additionally, when arrested on state charges, defendant was found to be in possession of an AK-47 type assault rifle.  PSR, p.7, para. 33.  *See United States v. Mazur*, No. CR 18-68, 2020 WL 2113613, at *5 (E.D. La. May 4, 2020) (Africk, J.) ("The nature and circumstances of the instant offense combined with Mazur's history of violent crimes demonstrate that he would be a danger to the community if released."); *United States v. Butler*, 2020 U.S. Dist. LEXIS 61021, at *4 (S.D.N.Y. Apr. 7, 2020) (considering § 3553(a) factors, defendant's "criminal records reflects a

pattern of violent and dangerous conduct" and, among other things, "[w]hile the prospect of contracting COVID-19 undeniably presents a serious risk to Butler's health, his release some 45 months early at least equally exposes the community to a serious risk that he would resume violence."); *United States v. Clark*, 2020 WL 1874140, at *3 (M.D.N.C. Apr. 15, 2020) (despite that defendant was on an "end-of-life" trajectory due to a terminal medical condition, district court weighed § 3553(a) factors to deny compassionate release because he "engaged in a calculated, persistent, and brutally-enforced sex-trafficking scheme for his personal profit and perverse pleasure[,]" and, "[w]hat's more, he engaged in this conduct following a significant criminal history and while on probation for other felony convictions."). This, alone, is a sufficient reason to deny a sentence reduction.

Additionally, Dyer has a history of failure to abide by external rules and conditions by routinely committing infractions while in prison. Defendant was disciplined (as recently as 2018) for fighting with an inmate; possessing unauthorized items; using narcotics; using morphine; mail abuse; possessing gambling paraphernalia; fighting with another person; assault; possessing a cell phone; use of drugs/alcohol (2001); use of drugs/alcohol (2000); interfering with security devices; and possessing drugs/alcohol (1999). *See* Exhibit A, Inmate Chronological Discipline Record for Donald A. Dyer. Although defendant admits that as a young man he "did not go free of rule inflictions (sic) " and has recently stayed out of trouble and acquired certificates, he has not met his burden of proof that "he is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g)." *See United States v. Smith*, No. CR. 14-154, 2020 WL 3576937 at 1 (E.D. La. July 1, 2020) (Barbier, J).

19

As one district court has observed, the factors can preclude relief even for a white-collar defendant with no history of violence:

> The Court recognized the severity of Reed's criminal offenses at the time of his sentencing, but after considering the amorphous and fluid state of the jurisprudence defining unlawful action relating to holding public office, as well as Reed's age and physical infirmities, the Court concluded that a significant downward variance was warranted and reduced Reed's sentence from the guideline range of 108 to 134 months in prison down to 48 months in prison. Of the four-year prison term to which he was sentenced, Reed has served one year of it, or 25 percent. Thus, Reed was already sentenced to 60 months less than the low end of the guideline range suggested for a criminal defendant with similar offense levels and criminal histories and is now seeking to be released after serving only 12 months. The Court concludes that early release at this time would create sentencing disparities between Reed and other defendants with similar records convicted of similar crimes, which is what § 3553(a) attempts to prevent. *See* 18 U.S.C. § 3553(a)(6).

*United States v. Reed*, No. CR 15-100, 2020 WL 2850145, at *4 (E.D. La. June 2, 2020) (Fallon, J.).

## II.   This Court has no authority to direct BOP to place the defendant in home confinement.

The defendant asks this Court to order BOP to transfer him to home confinement, but it is well-established that BOP has sole authority over an inmate's placement, with consideration given to a district court's non-binding recommendation. *See* 18 U.S.C. § 3621(b) (BOP is authorized to designate placement but will consider sentencing court's recommendation); *United States v. Voda*, 994 F.2d 149, 151 (5th Cir. 1993) (sentencing court "may recommend that a sentence imposed under section 3621 be served in a particular prison or jail," but "only the Bureau of Prisons has the actual authority to designate the place of incarceration"); *United States v. Reed*, No. CR 15-100, 2020 WL 2850145, at *5 (E.D. La. June 2, 2020) (Fallon, J.) ("With respect to home confinement, it is well-established that the BOP has sole authority to determine an inmate's placement, with consideration given to a district court's non-binding recommendation."). Accordingly, because the

defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("[T]he Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.") (emphasis in original). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). The defendant's request to serve the rest of his term in home confinement, as opposed to prison, however, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. The defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because the defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[27]

---

[27] If the Court finds that the defendant has satisfied the requirements for compassionate release and grants a sentence reduction under that statute, it can "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). In imposing a term of supervised release, the Court may impose a period of home confinement as a condition, provided that the court finds that home confinement is a "substitute for imprisonment." U.S.S.G. § 5F1.2; *see* 18 U.S.C. § 3583(d). As a "substitute for imprisonment," this supervised release term substitutes only for the term of imprisonment, to be followed by the original term

In conclusion, one district court observed:

> [T]he Court notes that "the BOP not only is aware of COVID-19, but also is taking its own measures to address the disease's impact," and "the BOP must use its expertise to consider both the impact of COVID-19 on individual prisoners, as well as the system-wide consequences of releasing prisoners as a response." *United States v. Calogero*, CM/ECF No. 18-203, R. Doc. 74 at 4 (E.D. La. Apr. 14, 2020). In light of COVID-19, the "BOP has increased [h]ome [c]onfinement by over 40% since March and is continuing to aggressively screen all potential inmates for [h]ome [c]onfinement," and "[i]nmates do not need to apply to be considered for home confinement." Federal Bureau of Prisons, Update on COVID-19 and Home Confinement (Apr. 5, 2020).[28] The Court thus concludes that not only does the BOP have sole authority to determine whether home confinement is appropriate, it is also the best positioned to make this determination. In the instant case, the BOP has not determined that Reed is an appropriate candidate for home confinement.

*United States v. Reed*, No. CR 15-100, 2020 WL 2850145, at *5 (E.D. La. June 2, 2020) (Fallon, J.). Here, BOP has determined that Dyer is not an appropriate candidate for home confinement.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny the defendant's motion for release based on COVID-19 concerns.

Respectfully submitted,

PETER G. STRASSER
UNITED STATES ATTORNEY

*/s/ Julia K. Evans*
JULIA K. EVANS
Assistant United States Attorney
650 Poydras Street, Suite 1600
New Orleans, Louisiana  70130
Telephone:  (504) 680-3162
Email:  Julia.Evans2@usdoj.gov

---

of supervised release imposed at sentencing. Alternatively, upon finding the defendant has satisfied the compassionate release statute, it may consider reducing the term of imprisonment to time-served and modifying the existing term of supervised release to add a period of home confinement. *See* U.S.S.G. § 5F1.2; 18 U.S.C. § 3583(e)(2).

28 *See* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2020, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Louisiana, using the electronic case filing system of the court. I also mailed a paper copy to: Donald A. Dyer, #25959-034, F-1 119, Yazoo City Medium, Federal Correctional Institution, P.O. Box 5000, Yazoo City, MS 39194.

*/s/ Julia K. Evans*
JULIA K. EVANS
Assistant United States Attorney

23